[Civ. No. 5150. Fourth Dist. Aug. 3, 1956.]

ROBERT W. KRUSE et al., Respondents, v. GEORGE
SIDNEY MILLER, Appellant.

Martin & Martin and Mahedy & Schall for Appellant.

Vincent Whelan for Respondents.

MUSSELL, J.—On October 11, 1950, plaintiffs, who owned a house and lot on Whitman Street in San Diego, listed their property for sale with one G. T. Garrity, a licensed real estate broker. The defendant, who was also a licensed real estate broker, with the permission and at the request of Garrity, showed the property to George O. Carter and his wife. The Carters were interested in buying the house if it could be enlarged and on or about October 11, 1950, after they had inspected the interior of the building, Carter asked Miller if the lot was a "filled lot" and Miller said "No." Carter then told Miller that he intended to build on and make it an ideal home. Relying upon Miller's statement that the lot was not "filled," the Carters purchased the property and moved into the house on or about October 27, 1950. The house, in fact, was on a filled lot and some time prior to October 1, 1951, it began to sink, and the Carters then discovered the fact that it was built on a filled lot. On October 11, 1951, Carter served notice of rescission of the contract of purchase on plaintiffs on the ground that Miller had falsely represented to him that

the lot was not a filled lot. Plaintiffs were not aware of the statement made by Miller to the Carters and when they asked Miller, through their attorney and through Garrity, if he had made such a representation, he denied it. Plaintiffs, then relying on Miller's statement, refused to rescind the contract of sale, whereupon a suit for rescission of the contract and for damages was filed by the Carters against plaintiffs herein and, again relying on Miller's denial that he had made the false representation, plaintiffs contested the action. The Carters obtained a judgment against the Kruses in that action for $6,691.97 and this judgment was satisfied on or about May 14, 1953, by payment of said sum to the Carters. After the satisfaction of this judgment and the rescission, the Gray's Mortgage and Loan Corporation, which had sold the property to the Kruses, entered into a compromise settlement with them in which the corporation took the property back and paid plaintiffs the sum of $3,500 net, in cash, therefor.

On March 1, 1954, the present action was commenced by plaintiffs to recover from Miller the following sums:

$3,191.97 (Amount paid on Carter judgment after deducting $3,500 received from Gray's Mortgage and Loan Company.)

$575.00 (Broker's commission on sale to Carters.)

$60.50 (Escrow charges on sale to Carters.)

$800.00 (Attorney's fees incurred in defending the Carter action.)

$113.35 (Court costs defending Carter action.)

$111.16 (Loss of earnings for time spent defending Carter action.)

Total—$4,857.98.

The trial court rendered judgment in favor of plaintiffs and against defendant Miller for the total sum of $4,857.98, plus costs, and defendant appeals from the judgment, claiming that it is erroneous.

■ The first argument presented by appellant in support of this claim is that no cause of action for fraud was stated or proven. This argument is without merit. It is alleged in the complaint that the defendant, in his capacity as a real estate broker, undertook to act as agent for the plaintiffs in the sale of the property involved; that while acting as such agent, he showed the property to prospective purchasers, Carter and his wife; that he represented to them that the residence was not built on a filled lot; that the lot was in fact a filled lot and that it had been built up to a height of several feet

above its normal level by placing thereon loose earth and debris; that the fact that the lot was filled was not apparent to a visual inspection and was not known to plaintiffs; that the representations made by defendant were made for the purpose of inducing the Carters to purchase the property and were believed and relied upon by them, and in reliance upon such representations, the Carters purchased the property; that said representations were made without the knowledge of plaintiffs and without any authority from them; that defendant failed to disclose said representations to plaintiffs; that the Carters rescinded their contract with plaintiffs and judgment was rendered in their favor and against the plaintiffs in a rescission action; that plaintiffs were damaged in the amount of this judgment, which they paid, and by other expenses incurred by reason of the statements of defendant to the Carters. We conclude that a cause of action for fraud was sufficiently pleaded and that there is substantial evidence of the facts alleged.

Section 1709 of the Civil Code provides that one who wilfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers, and deceit is defined in section 1710 of said code, subdivision 3, as the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact. Section 1573 of said code, subdivision 1, provides that constructive fraud consists ''In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him.''

In the instant case Miller violated his duty to plaintiffs, his principals, by not informing them of the representations he had made to the Carters that the lot was not a filled lot, and thereby perpetrated a fraud upon the confidence bestowed upon him by the plaintiffs. (2 Cal.Jur.2d, Agency, § 104.) As is said in *Vance* v. *Supreme Lodge F. B.*, 15 Cal.App. 178, 182-183 [114 P. 83]:

''It is very uniformly held, however, that where any relation of confidence and trust exists between the parties which demands that the information communicated respecting the subject of their dealings be full and complete, any concealment or misrepresentation will amount to fraud sufficient to entitle the party injured thereby to an action. The con-

tract between plaintiff and defendant created here the relation of principal and agent. Upon the agent, because of the existence of such relation, there was the duty of informing his principal fully and correctly regarding all matters concerned in the business then being transacted under his contract of agency.''

The record shows that Kruse had no dealings with Miller in respect to the listing or sale of the property and that Miller was acting with the express permission of Garrity, who had the listing. Under the circumstances shown, Miller, as a subagent, was under the same duty as Garrity to act in the utmost good faith. (2 Cal.Jur.2d, Agency, § 69.)

It is next argued that the plaintiffs' action is barred by the statute of limitations. This argument is likewise without merit. The notice of rescission by the Carters was served on Kruse on October 11, 1951, and this action was filed on March 1, 1954, less than three years after the filing of the notice of rescission. Since the complaint states a cause of action for relief on the ground of fraud, the provisions of section 338, subdivision 4, of the Code of Civil Procedure, which authorizes an action for relief on the ground of fraud within three years, are applicable.

Finally, it is argued that plaintiffs suffered no damage by reason of their compliance with the decree in the rescission action. We cannot agree with this contention. Section 3333 of the Civil Code provides that ''For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.'' Under this provision and under the provisions of section 1709 of said code, plaintiffs are entitled to recover such damages as resulted from the fraud of Miller. Since Miller was not authorized to make the false representations to the Carters, he subjected the plaintiffs to liability because of his fraudulent acts and was chargeable with the loss which resulted therefrom. (Rest., Agency, § 401, p. 914.) The finding of the trial court that plaintiffs suffered damages in the sum of $4,857.98 by reason of the wrongful and fraudulent conduct of the defendant is supported by substantial evidence and cannot here be disturbed. It was stipulated that the sum of $3,500 was paid to the plaintiffs in their compromise settlement with the Gray's Mortgage and Loan Company and there

is no substantial evidence that the plaintiffs could or should have received more than this sum for their interest in the property. Plaintiffs were under a duty to defendant to mitigate the damages, if any, accruing to them by reason of the defendant's wrongful representation (14 Cal.Jur.2d, Damages, § 111), and it appears that they performed this duty by an early and advantageous sale to the Gray's Mortgage and Loan Company.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied August 21, 1956, and appellant's petition for a hearing by the Supreme Court was denied September 25, 1956.

[Civ. No. 5171. Fourth Dist. Aug. 3, 1956.]

THE PEOPLE ex rel. Department of Public Works, Appellant, v. FRANK COZZA, Respondent.

George C. Hadley, Paul E. Overton, and Joseph A. Montoya for Appellant.

A. V. Falcone for Respondent.

BARNARD, P. J.—This is an appeal from an interlocutory judgment condemning three parcels of land, for use in constructing a freeway between San Diego and the international border at San Ysidro. These parcels were part of a farm of 145.9 acres owned and operated by the defendant. This farm was an irregular tract nearly a half mile wide on the north and on the south, but with a narrow neck in the middle which was approximately 1,000 feet from east to west, and 1,200 feet from north to south. The new freeway crosses the defendant's property near the middle of this narrow neck. The remaining property north of the freeway is 86.57 acres, and that south of the freeway is 54.50 acres. One of the parcels taken, Parcel 14, is the part of the narrow neck thus occupied by the freeway. It is 166 feet wide, about 1,000 feet long, and contains 4.03 acres. The other two parcels taken, Parcels 15-A and 15-B, are located at the northwest corner of defendant's land, some half mile from the narrow neck, and have no important bearing on the controversy here. Parcel 15-A contains 0.07 acres, and Parcel 15-B contains 112 square feet.

It appears, without dispute, that the defendant farmed this property as a unit, having bought it for that purpose. He was raising row crops, largely celery, tomatoes and cucumbers. The soil and climate are particularly adapted to this purpose, and such farming is unusually expensive but produces large returns. The defendant lived on the property and maintained a crew living on the premises of between 40 and 45 at times, with a yearly average of 25. He had heavy and extensive equipment which was moved about the farm as needed. The headquarter buildings are on the part north of the new freeway, but that portion of the farm has no independent source of water. Water was produced by three wells on the portion of the farm south of the new freeway, and water was taken to the north part, through the narrow neck, by a pipeline. In constructing the freeway it was necessary to cut this pipeline, but as part of the construction plans this pipeline was reconnected by a pipe running under the freeway through a larger pipe, so as to enable that portion of the pipeline to be withdrawn for repairs. The freeway

as completed across defendant's property was five feet above the ground on either side and fences were erected along both sides of the freeway, making it necessary for men and equipment to be moved from a mile to two miles in going from the south part of the farm to the north part. In doing this it would also be necessary for the men and equipment to be moved across this heavily traveled freeway at a point near the northwest corner of the defendant's property, and there was a great deal of evidence with respect to the difficulty, danger and expense involved in doing this.

The defendant's answer alleged that the value of the three parcels taken was in excess of $8,205, and that the severance damages would be $40,570. An amended answer, filed on the first day of the trial, alleged that the value of the parts taken was $8,300 and the severance damages $141,797.50. One witness for the plaintiff valued the property taken at $7,290 and the severance damages at $5,710. The other witness for the plaintiff valued the property taken at $6,205, and the severance damages at $3,015. Four witnesses for the defendant valued the property taken at $8,205 and the severance damages at $141,797.50. The other witness for the defendant valued the property taken at $8,300 and the severance damages at $97,785. The jury, which had viewed the property, valued Parcel 14 at $8,060, Parcel 15-A at $140, Parcel 15-B at $6.00, and fixed the severance damages at $56,428. The court adopted the jury's findings as to values and damages, and by its findings and judgment awarded the defendant a total of $64,634. No motion for a new trial was made, and the plaintiff has appealed from the judgment.

No complaint is here made with respect to the award for the value of the three parcels taken, and no severance damage appears in connection with Parcel 15-A and Parcel 15-B. The controversy here is with respect to the severance damages allowed in connection with Parcel 14, the taking of which interfered with the operation of defendant's farm as theretofore conducted. All of the witnesses on both sides testified that the taking of Parcel 14 would damage the remaining part of the ranch, and all of them testified that the highest and best use of the land was agricultural and for row crops, which was the use to which the land was being put. Reasons for the opinions on value were given by all witnesses and the witnesses for the defendant, in addition to such matters as the increased cost, difficulty and danger in the operation of the two parts of the farm, testified to other elements of damage

in such matters as flood hazard and the draining of waters onto the property from a long stretch of the freeway.

Appellant's first contention is that the court committed prejudicial error "in striking the testimony" of its first witness. It is argued that appellant's theory was that the highest and best use of the remaining property was to develop and operate it as two separate farms; that as so operated the remaining property would have had substantially the same market value after the taking as it had before; and that the striking of the testimony of this witness, and the rulings of the court in this connection, had the effect of preventing the appellant from presenting its theory of the case to the jury and the reasons upon which appellant's witnesses based their opinions.

This witness, Mr. Cotton, was a real estate agent with no experience in farming. He testified that in his opinion the highest and best use of this land both *before and after* is for agricultural purposes, for farming, and "as it was then and is now farmed." He was then asked what the highest and best use would be *after* the taking of Parcel 14. An objection was sustained, the court stating that he had already said it was the same before and after. He was then asked what was the highest and best use of the remaining property after the taking. An objection was overruled and he replied that in his opinion the highest and best use after the taking "is for the operation of the property agriculturally as farms." He was then asked his reasons for that opinion and replied that in his opinion "the property could be better operated as two farms afterwards than it could be as one farm afterwards." A motion to strike this answer was granted, and the jury was told not to consider that answer. However, this witness testified on cross-examination that in arriving at his figure of $5,710 as severance damage he considered that the amount of damage would depend on how the defendant operated; that if he continued to operate by moving men and equipment from one part of the farm to the other the amount of damage would be increased; that "I consider he might operate it that way but I don't consider that to be the practical way to operate it"; that his figure of $5,710 was based upon how he thought a prudent farmer would operate the property; that he thought $5,700 would be adequate compensation "because that is based upon my opinion of fair market value before and after"; and that if the defendant operated the way he had been doing he might be damaged by more than

$5,700. In this connection the court instructed the jury that it could not consider this land as being operated by two separate owners; that it was to figure the damages on the basis of ''one ownership as it is now''; and that ''the owner of course is required to meet the changing conditions with what we call reasonable husbandry. He can't just sit tight and let things stay as they are if a reasonable, prudent farmer operating that would make reasonable changes within his means in doing it.''

No authority is cited for the theory that plaintiff was entitled to show that the highest and best use of the remaining property was to develop and operate it as two separate farms, and we have found none. That the remaining property should be considered as a unit in determining the severance damages is indicated by the language used in section 1248 of the Code of Civil Procedure, and the principles expressed in *People* v. *Ricciardi,* 23 Cal.2d 390 [144 P.2d 799], where the court approved as a proper element of severance damages ''the impairment of the use of the property as a functioning unit caused by the taking'' of the portions sought to be condemned. This view is confirmed by the principles pointed out in *Welton* v. *State Highway Com.,* 211 Iowa 625 [233 N.W. 876], and in 29 C.J.S., sections 139, 140, 981, 982, 274, and 1270. The defendant had purchased this land for operation as a unit after rejecting smaller tracts, and had so operated it. There are well-known advantages in operating a larger tract of land as a unit, especially where it involves the use of large numbers of men and extensive and large equipment. Under established principles it would seem logical that the severance damage actually caused to this defendant should be the damage to his continued operation of the farm as a unit. The conjectural question as to the possibility of his reducing the damage by dividing the equipment and men between the two parts of the remaining land, with the erection of new buildings on the southerly part, should not be allowed to affect the basic question as to the highest and best use of the land, where the land had been and was being used as a unit and where the northern portion of the remainder was absolutely dependent upon the southern portion for irrigating water. Under the circumstances, it was not error for the court to strike the one answer here in question. As a practical matter, no prejudice appears because evidence of the plaintiff's theory was before the jury and the court's instruction was sufficiently broad to permit them

to consider it, although it rather obviously appears that the jury was not impressed by that theory.

It is next contended that the court erred in instructing the jury as follows: ". . . and that remaining property damage is this: it is the difference between the fair market value of property before the freeway was taken or any construction was put in, to wit, July 24, 1953, and the fair market value of that remaining property as it exists after the completion of the freeway and the location it is now." It is argued that this instructed the jury to follow an improper method of computing severance damages; that it told the jury to find the severance damages to the remaining property by subtracting the fair market value of the remainder after the completion of the freeway from the fair market value of the whole property before any parcel was taken; that this required the plaintiff to pay twice for the value of the parts taken, once in valuing the parts taken and again in valuing the severance damage; and that this instruction alone caused the verdict of the jury as to severance damages to be excessive, at least in the amount of $8,206. The language used in the portion of the instruction complained of is not reasonably subject to this interpretation. The above quoted language was in the middle of a long instruction. Immediately prior to the quoted language the court told the jury that in considering the damages to the remaining property it was to consider the opinions given by the experts and other qualified witnesses with the reasons given by them, and all of the facts shown by the evidence. Immediately after the quoted language the court said: "All of these separate things you are to consider; you are entitled to talk them over but lets get back and reduce it to our measure that the law contemplates, not a particular use, not an individual's ideas, but the fair market value, the difference between the property left as it was before the improvement was put in and after the improvement was put in." It clearly appears from the instruction as a whole that in the portion complained of the court was talking only about the damage to the remaining property and not the value of the original property before the improvement was made. There were not "two diametrically opposed instructions," as argued by the plaintiff, and in view of the instruction as a whole it cannot reasonably be held that the jury may have been misled with respect to the proper method of computing severance damages.

It is next contended that the court erroneously instructed

the jury to value the property as it was used by respondent. The various contentions under this point are sufficiently covered in the first point herein considered. The instructions in this connection, as a whole, were proper under the evidence and no reversible error appears therein.

It is next contended that the court instructed the jury to adjust the evidence so it would preponderate on the side of the defendant. Again, this refers to a portion of a long instruction taken out of context. In this instruction, covering the burden of proof or preponderance of the evidence, the court told the jury that it is not the amount of preponderance but whether the evidence preponderates in favor of or against the person having the burden of proof that is controlling; that in connection with the values and damages to be considered in this case the burden of proof by a preponderance of evidence "is on Mr. Cozza"; that it should arrive at the figures respecting the value of the property taken and the amount of damage caused by determining where the preponderance of the evidence lies on those issues. This is followed by the sentence complained of, which reads: "You can talk over together your separate figures, and if you come to an equal balanced place then you have got to adjust it so that the preponderance lies on the side as established by Mr. Cozza." This was immediately followed by these words: "That doesn't mean you can only consider his witnesses. It means that you can consider all of the evidence introduced in the case no matter by whom introduced, but it gets back to the fact that whatever is established as the value must be established by Mr. Cozza by this preponderance of the evidence." It clearly appears that in the sentence complained of the court meant that if the evidence seemed to be evenly balanced it would have to be found that the preponderance lay with the defendant before a judgment for such amounts could be entered in his favor. The court was instructing the jury orally and as a natural result all portions were not too well expressed. However, in view of the instruction as a whole it cannot reasonably be held that the jury was misled in this connection or that, as argued by the appellant, this quoted sentence was tantamount to a directed verdict on the evidence produced by the defendant.

It is next contended that the court instructed the jury that this trial was before it because governmental agencies seek to coerce property owners. It is argued that it is well known that jurors are quite apt to give great weight to any

hint from the judge as to his opinions concerning a case, and that the judge's remark ''you'd be surprised to learn what governmental agencies in the past have tried to get away with'' prejudiced the plaintiff's case and caused the jury to base its verdict on undue sympathy for the ''coerced'' defendant.

In the course of his instructions the judge explained that this was a proceeding in eminent domain or condemnation, and explained what that means. He explained that if the parties in such a proceeding failed to agree on the amount of compensation that is fair to both sides then they have the right under our American system of submitting this to a jury. The judge then made the statement above quoted and referred to a case about 1867 where Congress passed a law condemning land for a dam site and fixing the amount to be paid, and the landowner took the case to the Supreme Court of the United States where the rule was established that under our form of government no power was vested in anyone except a jury to determine the amount that should be paid. While these remarks were entirely unnecessary, and would much better have been omitted, it clearly appears from the entire instruction that there was no suggestion of ''coercion'' in this case. The right of the plaintiff to take this property was not questioned during the trial, there had been no evidence of any coercion, and the only issues presented were those relating to the respective amounts of compensation to be paid. The court also instructed the jury to disregard any idea or comment or conclusion which he may have made respecting the facts in the case. It cannot reasonably be concluded that the verdict was in any way affected by the remark here in question.

█ Finally, it is contended that the judgment as entered is in excess of the court's jurisdiction in two respects. It is first contended that the judgment fails to condemn a fee simple title to the plaintiff because it provided that the defendant should have an irrevocable easement, within the boundary lines of the freeway, to maintain and repair the water pipeline, which was constructed by the plaintiff in accordance with the freeway construction plans. It is argued that the resolution adopted by the highway commission authorized the plaintiff to acquire a fee simple title in the lands condemned; that this resolution is controlling and binding as to the quantum of the estate to be condemned; that the

resolution is by statute made conclusive evidence that the interest in the property sought to be acquired is necessary; and that a judgment granting a lesser estate is erroneous and must be reversed. This refers to the pipeline carrying water from the remaining property south of the freeway to the portion north of the freeway, which pipeline the plaintiff severed during the construction work and then reconnected through a larger pipe under the freeway in order that the pipeline could be serviced and repaired when necessary. It appears, without conflict, that this matter was included in the construction plans of the plaintiff and it was repeatedly stipulated during the trial that this pipeline was to remain there, that it was a part of the proposed improvement, and that a provision giving a nonrevocable easement for that purpose to the defendant should be included in the judgment. The court accepted the stipulation to this effect and took the matter from the jury's consideration, telling the jury that the parties had stipulated to the pipeline easement. The judgment gave the plaintiff exactly what it asked for and agreed to, and no reversible error appears in this connection. We find nothing in the case of *People* v. *Schultz Co.*, 123 Cal.App.2d 925 [268 P.2d 117], which suggests or compels a different conclusion.

It is further contended that the judgment fails to grant a clear title to the plaintiff since it recites that the remainder of the defendant's property is adequate security for two existing trust deeds and a crop and chattel mortgage, but fails to cancel these instruments; and since it did not provide for the payment or cancellation of taxes. These trust deeds and the mortgage were those held by the other defendants, who have not appealed. These defendants not only defaulted, but filed a waiver waiving any payment from the judgment, acknowledging that their liens were adequately secured by the remainder of the defendant's farm, and stipulating that the court might find accordingly. No possible prejudice appears. The taxes were all paid and there were no tax liens on the property at the time, as appears from the certificate of the county auditor which was filed before the judgment.

The amount of severance damages fixed by the jury appears to be quite liberal, but it is supported by the evidence. The jury viewed the premises, and it was conceded by everyone that the remaining property was damaged to a considerable

extent. Under the evidence it cannot be held that the amount arrived at by the jury was the result of passion or prejudice. The amount allowed might well have been reduced on a motion for a new trial, but no such motion was made.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied August 30, 1956, and appellant's petition for a hearing by the Supreme Court was denied September 25, 1956. Traynor, J., and Spence, J., were of the opinion that the petition should be granted.

[Crim. No. 3240. First Dist., Div. Two. Aug. 6, 1956.]

THE PEOPLE, Appellant, v. RAYMOND JIMINEZ et al., Respondents.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Appellant.

Edward T. Mancuso, Public Defender, Robert Nicco, Deputy Public Defender, Benjamin M. Davis, Lionel Browne and Harry Wainwright for Respondents.

THE COURT.—This is an appeal by the People from an order dismissing informations against Raymond Jiminez who had been charged with possession of marijuana, and Tony Galvan and John R. Balazs who had been charged with transportation thereof. The dismissals were granted by the trial court on the basis that search for and seizure of the indispensable evidence, which was marijuana, was unlawful. When the officers found the first quantity of marijuana in an automobile in which defendants had been, they were looking, not for narcotics, but for weapons. Consideration of the evidence, then, falls into two categories: first, that which has to do with the police investigation in the matter of weapons, and second, that which has to do with search for narcotics.

On October 27, 1955, the police officers who later arrested defendants were told by their lieutenant when they reported for duty in the late afternoon that there was to be a juvenile gang fight in the Glen Park district between 7 and 9 o'clock that night. They were informed by the lieutenant that several of the juveniles were armed with guns which they had attached to their legs, and they were instructed to stop and to question "suspicious juveniles" in cars and on foot. At about 7:20 p. m., it being dark, the officer who later arrested defendants was told by another officer that persons armed with chains and baseball bats had been stopped in the neighborhood. At 7:30 p. m. the officer in his patrol car saw a car with three young men in it driving down Chenery Street, and after he had circled the block, he saw this car parked at Chenery and Diamond Streets, and now a fourth young man was in it. The place was one block from the center of the Glen Park district and six blocks from the playground where the fight was supposed to occur. The officer stopped and approached the car, and when he was about four feet

away, he saw defendant Balazs, who was in the front seat, lean towards the seat of the car. He thought he was reaching for a gun. With this, he ordered the occupants to get out of the car, which they did. Up to this point, then, the police work was concerned with the possible gang fight and with the weapons that might be used in it. The reasonableness of the police activity up to this point is discussed following narration of those features of the case relating to narcotics.

As soon as the four had emerged from the car, the officer cast the beam of his flashlight into the car and saw a plastic vial containing two partly smoked cigarettes on the front seat. These later proved to be marijuana. He saw a Prince Albert can on the floor of the car, which, when opened, was found to contain marijuana. At this point, defendants were arrested. Jiminez was searched, and two marijuana cigarettes were found in his pocket. Two packages of cigarette paper were found in the glove compartment of the car.

We are, of course, mindful of the proposition that the reasonableness of any search is not to be justified by what the search turns up but by appearances to the searcher at the time of his action. We believe the officers were thoroughly justified in interrogating defendants and in ordering them from the car. The information they had received at the police station was corroborated by the intelligence that other persons had been seen carrying weapons for a fight. The officers had a right to interrogate persons on the streets in the nighttime. (*People* v. *Simon*, 45 Cal.2d 645, 650 [290 P.2d 531].) When, as they approached defendants to perform this lawful duty, they saw the Balazs movement, they were justified in thinking it likely that he had a weapon.

If the proposition holds true that search is not justified by its results, the converse holds true that a search based on appearances is not rendered unlawful by the fact that the contraband actually on hand was not that which reasonably was thought to be present.

The case of *People* v. *Blodgett*, 46 Cal.2d 114 [293 P.2d 57], is very much in point. Officers saw a cab parked in front of a hotel at 3 a. m., a man and woman in the back seat. The officers ordered them out, and saw one of them withdraw his hand from the juncture of the seat and back cushion. The officer removed the seat and found three marijuana cigarettes The furtive action of defendant was held to have given reasonable grounds for belief that he was hiding contraband. His

act was similar to that of Balazs in the present case, but the present case is somewhat stronger for the People because the ordering of the occupants out of the car in the Blodgett case was before, and in this case after, the furtive motion. It is a natural impulse on confrontation to hide immediately any contraband, and one cannot be heard to complain that he, or a companion, has betrayed the presence of illegal goods by the alacrity with which he attempted to conceal them. Likewise, as was said in *People* v. *Martin,* 46 Cal.2d 106 [293 P.2d 52], the officers in making the investigation had a right to protect themselves, as by ordering the men out. It should be said in fairness to the trial court in the present case that when its ruling was made the Blodgett and Martin decisions had not been rendered by the Supreme Court.

The case of *People* v. *Harvey,* 142 Cal.App.2d 728 [299 P.2d 310], is quite distinguishable. In that case, the officers were proceeding with an arrest before the suspicious movements were made. Here, the arrest came later, after the investigation had produced ample cause for the arrest.

Bearing in mind, as defendants remind us we must, that the officers' actions are to be tested in the light of what then appeared to them, let us suppose that they had not ordered defendants out, and that there had been a gang fight with serious and perhaps fatal results, which have not been unknown in such encounters, surely a reasonable person then testing the officers' inaction in the face of what they had heard and what they saw would conclude that they had failed to perform their duty which is, among many others, to guard the persons and property of citizens from assault, destruction and injury. (*People* v. *Roberts,* *(Cal.App.) 299 P.2d 313.)

The police action was far different from the general "road block" tactics which were found unreasonable in *People* v. *Gale,* 46 Cal.2d 253 [294 P.2d 13], cited by respondents. In the case before us, the activity was limited in time to the hours of the suspected fight, to the general area where it was supposed to take place, to young persons and even then, the final act of ordering the young men from the car came only after the movement described above. Considering the task presented to the officers, both of preserving the peace and of arresting those who might be guilty of conspiracy to commit an assault (such conspiracy being a felony, Pen. Code, § 182),

---

*A hearing was granted by the Supreme Court on August 8, 1956. The final opinion of that court is reported in 47 Cal.2d 374 [303 P.2d 721].

considering the fact that it was nighttime, that the defendants were not in a house but in a highly mobile vehicle, and regarding the evidence the officers had before them, we believe it was their duty to make the investigation they did.

Now, as to the second part of the officers' action. When they saw the vial containing two partly smoked cigarettes, they deduced that these were not ordinary butts being so carefully preserved, especially considering the movement described above. In fact, respondents are silent as to the reasonableness of this deduction. They argue that the next object seen, the Prince Albert can, was, on its face, an innocent thing; but in an investigation, one thing leads logically to another, and it was reasonable to infer that the can, which was in the vicinity of the reaching movement of Balazs, contained, as it was proved to contain, the same substance as the vial. These discoveries, in turn, made the search of the pockets a reasonable one, and so, in the chain of events, the marijuana in Jiminez' pocket was found. The continuing search was reasonable under the circumstances.

The order dismissing the informations is reversed.

[Civ. No. 21496. Second Dist., Div. Two. Aug. 6, 1956.]

C. D. PRUITT et al., Appellants, v. JOSEPH FONTANA, Respondent.

Wolver & Wolver for Appellants.

Voorhees, Stewart & Voorhees for Respondent.

FOX, J.—Plaintiffs appeal from a judgment dismissing the action. The appeal has also been taken from orders striking their fourth amended complaint and denying their motion to permit the filing of such pleading.

On March 24, 1955, after demurrers to his original complaint and two amended pleadings had been sustained, plaintiff C. D. Pruitt filed his third amended complaint for damages for breach of contract comprising two causes of action. On April 14, 1955, a demurrer to this pleading was sustained and plaintiff was allowed 10 days to amend. On May 3, 1955, subsequent to the 10 days' leave period, a fourth amended complaint was filed, adding Citrus Homes as a party plaintiff. Three additional causes of action were included in this amended pleading. Defendant thereupon demurred to the fourth amended complaint and also filed a motion to strike the entire pleading. The motion to strike was made essentially on the ground that the fourth amended complaint "adds new and substantially different causes of action and new parties than were included in all prior complaints." No question of the late filing was raised. On May 20, 1955, the motion to strike was granted.

On June 8, 1955, plaintiffs filed a notice of motion to reconsider the order striking the fourth amended complaint, and for leave to amend by filing the fourth amended complaint adding Citrus Homes as a new party plaintiff. The notice of motion was supported by an affidavit of plaintiff's attorney stating his recent research indicated (1) Citrus must be treated as a joint venturer with plaintiff; (2) that the agreement previously pleaded simply as a sales contract should be pleaded in the alternative as an option to purchase; and (3) the facts of the estoppel previously pleaded should be alleged in separate causes of action. The affidavit concluded that "failure to do so heretofore was the result of mistake, inadvertence or excusable neglect." On July 5, 1955, the motion to reconsider was granted. At the same time the court heard and denied plaintiff's motion for leave to file the fourth amended complaint. Defendant filed an application for dismissal under Code of Civil Procedure section 581, subdivision 3, for failure to amend the third amended complaint within the time allowed. This application was granted and the action dismissed.

It has been conceded on appeal that the question of the late filing of the fourth amended complaint is not before this court, since plaintiffs were granted additional time to file this pleading by oral stipulation of counsel. It is urged, however, (1) that plaintiffs' fourth amended complaint was properly stricken because it included a new party plaintiff and three additional causes of action without procuring leave of court; and (2) that in any event, the fourth amended complaint, like its predecessors, failed to allege a cause of action.

### THE THIRD AMENDED COMPLAINT

The third amended complaint is in two counts. Count I alleges the following facts:

1. Defendant owned approximately 25 acres of property in Los Angeles County, subject to a $42,500 deed of trust, of which Mr. and Mrs. Gorman were beneficiaries. On April 10, 1952, plaintiff and J. A. Thompson[1] entered into a written contract with defendant, as an unmarried man, for the purchase of this property for $78,986.25. The instrument was deposited in an escrow established that day to handle the transaction. Under the terms set forth in the instrument, which is pleaded only by its legal effect, the buyers were to

---

[1]Thompson subsequently assigned his interest to plaintiff.

pay into escrow the sum of $1,200 per acre on or before May 1, 1953. The balance was to be paid in full on or before September 1, 1953. The land was to be taken subject to covenants, easements, etc., of record "to be approved by the buyers." It was also agreed that the buyers would pay the Gormans $17,500 and execute a second deed of trust to the Gormans, subordinate to after-acquired construction loans, for the amount of the balance due. The instrument was made contingent upon receiving approval of the Gormans to the transaction.