[Civ. No. 24127. First Dist., Div. Two. Oct. 30, 1968.]

JOHN T. HARTONG et al., Plaintiffs and Respondents, v. PARTAKE, INC., Defendant and Appellant.

Boccardo, Blum, Lull, Niland, Teerlink & Bell, and Edward J. Niland for Defendant and Appellant.

Collins, Hays & Stewart, Collins, Hays, Stewart, Sanford & Berg and Walter V. Hays for Plaintiffs and Respondents.

TAYLOR, J.—Defendant Partake, Inc. (hereafter Partake) appeals from a judgment in favor of four of the plaintiffs in these consolidated actions for fraud in the inducement in the execution of certain franchise distribution contracts with a purported Partake subsidiary, Pacific Way, Inc. (hereafter Pacific). The questions on appeal are: (1) the sufficiency of the evidence to sustain the judgment and findings; (2) Partake's responsibility for the representations made to plaintiffs on the theory of ostensible authority; (3) the admission of certain evidence concerning the relationship between Partake and Pacific; and (4) the computation of the "additional" damages awarded to plaintiffs.[1]

Viewing the evidence most strongly in favor of the judgment, as we must, the following facts appear: Partake is a national organization, formed in 1961 as an Illinois corporation, in order to meet the problem of the high rate of failure on the part of individuals who attempt to go into business for themselves. The basic philosophy of Partake is expressed in the Biblical quotation (set forth below)[2] from which its name is derived, and its motto: "Helping to build a stronger free world through motive-action of individual enterprise."

Partake consists of Partake Central, the corporation with its staff, and Partake International, a loosely organized unincorporated association of Partake "Area Directors." Partake does not sell any particular products nor provide financing but acts as a "creating coordinating catalyst" in providing a

---

[1]The action was originally filed by seven plaintiffs against Partake, Pacific and several additional codefendants, but subsequently dismissed as to all defendants, except Pacific, Partake and Arthur W. Werry. Only Partake appeals from the judgment in favor of plaintiffs, Schiro, Hartong, Yoshimura and Bottemiller. Plaintiffs Starr and Chadwick recovered judgment against Werry as did Partake on its cross-complaint. Plaintiff Ott made no claim against Partake and was unsuccessful as to the other defendants.

[2]"The plowman ought to plow in hope, and the thresher ought to thresh in expectation of partaking of the harvest . . . and whatsoever you do, do all to the glory of God." 1 Corinthians 9:10; 10:31.

wide range of business and management consultant services. These services include product development, design, packaging, recruiting, promotion, merchandising, literature, advertising, market research and training programs, as well as an analysis of the potential and capabilities of individuals looking for a career in franchising. Partake primarily seeks three categories of clients: those with a marketable product or service "package" that can be developed as a national franchise; individuals with specialized products or services that require promotion; and franchisors who want to recruit additional franchisees.

Partake's services are provided by its network of independent marketing directors known as "Area Directors." Each Area Director is an experienced, qualified businessman who, by a contract with Partake, obtains an exclusive territory for providing Partake services. The responsibilities of an Area Director are three-fold: first, the acquisition of franchises for those franchisors who are clients of Partake and who wish to expand into his particular territory; second, the development of any local businesses that may want to become franchisor clients of Partake and sell franchises on a nationwide basis; and third, the performance of whatever consultant services are required by franchisor clients of Partake and for the franchisees of such franchisors in his territory.

Defendant Werry, a research and development manager of the Leslie Salt Company, in the fall of 1961, read Partake's advertisement for Area Directors in the Wall Street Journal and filed an application. After his educational and business qualifications were investigated and evaluated by Partake, Werry signed a "Partake Area Director" agreement in September 1961. In return for his investment of $1,900, Werry acquired an exclusive right to be Partake's Area Director for Santa Clara, San Benito, Monterey and Santa Cruz Counties. Partake agreed to continue its program of national promotion and publicity to establish and build its reputation as creator-coordinator of effective distribution organizations, and its program of developing "packages" of marketable services and products and to train Werry and provide him with a specialized kit of materials. To start in business, Werry received an initial "package" of materials, set forth below.[3]

---

[3] "SUPPLIES AND EQUIPMENT: As a part of the individual 'package' needed to start in business, PARTAKE agrees to provide the Area Director with:

"*Business supplies* such as personnel tests, order forms, business cards, letterheads, envelopes, bookkeeping system, auto decals, promotional

Among the materials furnished to Werry as part of his kit of promotional materials were statistics and stories on the great amount of business failures in the country, stories of phenomenal success in the franchise business, warnings against fraudulent franchises, articles about the outstanding background and qualifications of the Partake board of directors, as well as the success that Partake had during the short period of its life, and a Dun & Bradstreet report on Partake, promotional leaflets, and descriptions of the thorough investigations to which Partake subjects all franchisors or franchisees. Later Partake furnished Werry with additional materials containing Werry's picture as Area Director for California. Werry also obtained and put up a map[4] of the United States showing the location of all Area Directors.

The basic purpose of all of these materials was to inspire confidence in the Partake name and organization including its Area Directors and in particular to convince inexperienced persons wishing to go into business for themselves that the best way to achieve success and avoid fraud and failure was to rely on the expert advice of the Partake Area Directors. Because of the confidence-inspiring nature of its materials, Partake was very conscious of the risk of abuse. Its only protection was the exercise of great care in the selection of Area Directors, and a contract provision forbidding misuse of the materials.

---

literature, and advertising mats valued at approximately $150. Area Director will purchase additional supplies from PARTAKE as needed.

"*Professional source materials* such as books and periodicals, recordings, and films valued at approximately $250.

"*Sales training materials* such as films, recordings, charts for use in conducting sales training meetings valued at $300. These materials are on a continual exchange lease plan with new materials available each week.

"*Clients' information and sales kits* to provide data to recruit, test, evaluate, train, and counsel Client's local representative valued at $500.

"*Basic manuals,* films and records which provide the complete instructions to conduct an effective local PARTAKE business valued at $200. It is understood that the sales training materials, Client information and sales kits and basic manuals, films and records, a total value of $1000, remain the property of PARTAKE and are for the Area Director's use only as long as this agreement is in effect.

"*Equipment* which should include a polaroid Land flash camera, a sound projector and screen, a tape recorder, a typewriter and adding machine, are not included in this package, but can be obtained either from PARTAKE for an additional payment or locally."

An inventory of the contents of the initial package of supplies valued at about $271 was attached to the contract.

[4]Although the map was not furnished by Partake, it was the kind of additional promotional material an Area Director was authorized to obtain and use.

Partake also furnished its Area Directors with an aptitude test entitled "Profile" to be used in evaluating individuals who were interested in becoming franchisees of Partake clients. A completed "Profile" was a necessary step before an individual would be accepted as a franchisee of an approved Partake franchisor. For potential franchisor clients, Partake had developed an elaborate market research program entitled "Surv-Analysis," and the completion and evaluation thereof was necessary before an operation was accepted by Partake Central as an authorized franchisor. However, in some instances, Partake accepted franchisors on the basis of a single successful operation.

Werry's agreement with Partake expressly provided that as Area Director, he had the right to submit his own new service or product ideas, and if determined to be a marketable "package" that would not conflict with existing clients, could contract as a client with Partake to create and coordinate this new business for him on a national basis. Werry also has the right to invest in any "package" business created and coordinated for a client by Partake.[5]

After setting forth Werry's duties to execute the Partake program in accordance with the plan, as outlined in its manuals, to promote the same and maintain an orderly operation, the agreement further provided that: ". . . . it is understood that the Area Director will act and shall be in its relation with PARTAKE an independent contractor, Area Director agrees that he will not at any time, directly or indirectly, hold himself out as an agent, servant or employee of PARTAKE, nor make any commitments or incur any liabilities on behalf of PARTAKE without express written approval. Area Director shall be fully responsible for any damage, loss, or other claims arising out of the operations hereunder, whether conducted by himself, or his agents, employees or representatives."

The contract also provided for termination by either party for failure to comply with any of its provisions, as indicated below.[6]

---

[5] The Area Director's manual encouraged these director-client side agreements and made the development of national franchisor clients more profitable than other operations.

[6] ". . . upon giving to the other party 60 days notice in writing of the failure for which the termination is being made and notifying the other party of its intention to terminate this agreement therefor, providing the other party does not take corrective action within this 60-day period and comply with the terms of this agreement," and further provided that:

"Upon such termination, Area Director shall cease to have any right to perform any PARTAKE service or work with any PARTAKE Client, and

Werry's functions as a Partake Area Director were part-time, as he continued his full-time position with the Leslie Salt Company. He conducted his Partake activities out of his home in Berkeley for several months, until the spring of 1962 when he obtained office space in a house located at 237 Almendra Street in Los Gatos. This house was leased by Mrs. Davis, who, in turn, subleased the various rooms as offices. Mrs. Davis had her desk in the large front room of the house where she performed secretarial and answering services for several other businesses. She answered Werry's telephone ''Partake.'' Above the outside entrance was a sign saying ''Partake.''

In the fall of 1962, Werry met Leroy Raub (hereafter Raub) for the first time. Raub had been franchisee salesman and, after several discussions, decided he would like to work with Werry in the Partake program. On October 25, 1962, Werry appointed Raub as his Associate Area Director pursuant to a written agreement, a copy of which was sent to Partake. During a workshop in Los Angeles, Werry also personally informed Art Melvin, the Executive Director and Vice President of Partake, of Raub's appointment. The agreement between Werry and Raub paralleled some of the provisions of the agreement between Partake and Werry, including a clause prohibiting Raub from promoting or selling any service or product that had not been authorized and accepted by Partake Central under the pretense of being endorsed by Partake. Partake did not screen or investigate Raub as the hiring of employees was the responsibility of the Area Director. Partake merely required that such employees agree to the same basic terms concerning misrepresentation and commitment of Partake as the Area Director. Partake does not follow any systematic program of checking for abuses, but assumes that its Area Directors and their employees are using the Partake materials only for expressly authorized purposes until it hears something to the contrary.

Raub worked full-time and occupied the front office (No. 2) leased by Werry from Mrs. Davis. Werry, who usually worked evenings and weekends, occupied the rear office (No. 1). As Associate Area Director of Partake, Raub acquired from Werry the authority to utilize the Partake name and promo-

he will not have any right to hold himself out to the public as being an Area Director of PARTAKE. Area Director shall relinquish to PARTAKE the telephone numbers which have been used by him to receive PARTAKE calls.''

tional materials. Most of these promotional materials were kept in Raub's office, including the wall map of the United States with red dots showing the location of all Partake Area Directors. The "confidential" materials from Partake, Werry kept at his home.

Shortly after Raub came to work, he and Werry entered into partnership for the manufacture and sale of toys, paints and other specialty items through franchised rack distributorships under the name of "Western Way." Western Way's assets at this time included an option to purchase the plant, stock and equipment of the Ableman Corporation. The Ableman plant, located in Campbell, contained $30,000,-$40,000 of equipment (including a double-action vacuum former) for the manufacture of "Plast-O-Plaks" and warehousing facilities. "Plast-O-Plaks" are toy wall plaques made by placing a plaster of Paris-type mixture in plastic molds. Ableman had sold these toys successfully at the Seattle World's Fair but subsequently failed because of management and production problems, and insufficient distribution through toy and department stores. Werry believed these Plast-O-Plaks were an excelllent item for rack distribution and would be a desirable franchisor client for Partake.

Werry reserved with Partake a category for rack distributorships of toys, hardware and other items. The development of these "Western Way" distributorships with features common to other Partake franchisors, was in accord with Werry's functions of developing new franchisor clients for Partake. As indicated above, Werry had the right to become involved in businesses of his own, the only restriction being that the business of the potential new franchisor was not to conflict with any franchises already approved and authorized by Partake Central.[7] The Western Way distributorships were to be developed in such a way that they could eventually be accepted by Partake as a franchisor client for national distribution.

On March 6, 1963, the business of Western Way was transferred to Pacific Way, Inc.,[8] a California corporation, in which both Werry and Raub were interested, and in which they held the titles of President and Vice President, respectively. At the beginning of 1963, Raub worked full time at the

[7]Part of Partake's policy was to approve and authorize only one particular kind of product or service "package" for distribution as a national franchisor.

[8]As the name "Western Way" had been preempted, the name of the operation was changed to "Pacific Way."

Almendra Street office selling Partake franchises and setting up the Western Way-Pacific toy and hardware distributorships. There was no distinction between the Western Way and Partake operations and offices. Werry informed Partake of his and Raub's involvement in the development of Pacific as a potential franchisor.

Werry had also assigned to Raub as Associate Area Director, all responsibility for advertising. Accordingly, between January 5 and March 31, Raub ran a series of advertisements in various newspapers, like the San Jose Mercury News. The text of each of the ads was substantially as follows: "Wholesale distributor hardware and toys. Routes available full and part-time. If you have $3,000 and good credit, we will establish you in a profitable business with a minimum net income of $11,054.00 per year or your complete investment return. Write giving brief resume." Until the middle of March, all of the ads gave the name of Partake and the 237 Almendra, Los Gatos, address, or the telephone number there, which was answered by Mrs. Davis as "Partake." After the middle of March, some of the ads used the name "Pacific Way" and the Almendra address or telephone number.

Each of the plaintiffs saw one of the advertisements and responded, either by mail, telephone or in person.[9] Raub sent out most correspondence and used Partake stationery to answer letters. After the initial contact, each plaintiff came to the Almendra Street office and was told by Raub about Partake and the available toy and hardware distributorships. These discussions usually lasted several hours on several different days. During the course of the discussions, each plaintiff was given or shown some of the Partake promotional materials, including the wall map, the folder or book with Werry's picture, the Dun & Bradstreet report, etc.

As to each of the plaintiffs, except Ott, Raub represented that: 1) Western Way and Pacific were a part of Partake; that based upon the past sales records of the companies' productions, plaintiffs would be able to earn a minimum net income of $11,054 a year; 2) that the areas for which plaintiffs were being sold distributorships had been surveyed and the survey showed the required number of "placements"[10] that could be made; 3) that these placements would be made

---

[9]Although the particular facts varied as to the dates and times as to each of the plaintiffs, general sequence of events was similar. Significant variations will be set forth in the footnotes.

[10]A "placement" is a contract for the installation of a sales rack.

954

by specially trained people; 4) that Pacific, Western Way and Partake had immediate access to a large variety of educational materials of proven saleability which plaintiffs could interchange with the merchandise they first purchased; and 5) that Western Way and Pacific, with the help of Partake, intended to sponsor an extensive advertising campaign shortly after plaintiffs purchased their distributorships to assist plaintiffs in selling the products they purchased. All of the plaintiffs believed they would be entering a business backed by Partake, a national and soundly financed company with great expertise in the franchising business. Some of the plaintiffs checked with the Better Business Bureau about Partake, and received information confirming Werry and Raub's statements about the size and financial stability of Partake.

All of the plaintiffs then signed documents entitled "Independent Distributor Franchise Agreements" with Western Way or Pacific, on the dates set forth below.[11] When some of the plaintiffs asked why their contracts were with Western Way or Pacific instead of Partake, Werry and Raub indicated that Pacific was the West Coast branch of Partake. After some of the contracts were signed, Raub urged a group prayer for the success of the venture. Because of Werry's part-time activity, most of the plaintiffs[12] did not meet or see him until after the signing of their agreements. Werry was introduced as the Partake Area Director and President of Pacific and confirmed Raub's statements concerning Partake and its relationship with Western Way and Pacific. Two of the plaintiffs (Starr and Chadwick) were also introduced to Melvin.

Plaintiffs invested amounts varying from about $2,500 to about $6,000 in their respective five-year Independent Distributor Franchise Agreements and acquired exclusive territories for a certain number of "placements" to be obtained by Western Way, display merchandise[13] and display racks.[14]

[11]Plaintiffs Starr and Chadwick signed their agreements in January and February 1963, respectively, prior to the March 6, 1963, incorporation of Pacific. The others signed after that date as follows: Schiro on March 15, 1963; Bottemiller on March 23, 1963; Yoshimura on March 31, 1963; and Hartong on April 12, 1963.

[12]Werry was present when Starr and Chadwick signed their agreements and at this time represented that Western Way-Pacific was a western branch of Partake.

[13]All of the plaintiffs except Shiro contracted for toy distributorships and acquired 1,000 or more Plast-O-Plaks at $.41 each. Plaintiffs Schiro contracted for a hardware franchise. Later, some of the other plaintiffs also added paints to their stocks.

[14]The racks were valued at $20 each and plaintiffs acquired between 50 and 100 of them.

Plaintiffs started placing and servicing their racks at varying times between March and June of 1963. None of the plaintiffs ever received the total number of placements called for in his contract. Some experienced excellent sales until June. Whenever a plaintiff asked about the promised advertising, Raub and Werry told them that the Bay Area-wide advertising, particularly television advertising on a well-known children's program, was merely being held up until all of the distributorships had been sold.

On March 11, 1963, Melvin (the founder and Vice President of Partake and Executive Director of the Partake organization) made a routine field visit to Werry's office to see if he could be of any help, as Werry's monthly reports to Partake had indicated no activity in the sale of Partake services. As Werry was at work at Berkeley, he asked Raub to meet Melvin at the airport and show him around. Raub wanted to show Melvin that Pacific was a successful operation that could become an approved franchisor client of Partake. Melvin also visited Werry at the Almendra Street office in Los Gatos and met Starr and Chadwick.

While returning on the plane, Melvin dictated a termination notice for Werry to Partake Central. Thereafter, such notice, dated April 1, 1963, was sent to Werry and specified the following reasons for termination: (1) "Failure to actively assume service responsibilities. Continuance of full-time job outside Partake program"; (2) "Failure to promote the success of each client's business as directed by standard service requests. No franchise sales to date"; and (3) "Use of Partake advertising, office, and program to sell unauthorized franchise packages." In accordance with the contract provision quoted above (fn. 6), the notice was to be effective in 60 days (June 1) unless Werry took corrective action.

Werry replied to the termination notice by a letter dated April 13, 1963, denying Partake's complaints and stating that Partake had been fully informed about Pacific's program and granted him the right to engage in other businesses. The letter also indicated that with the subsequent removal of his Partake office to another location, Pacific would be completely separated. Werry's relationship with Partake was more or less severed[15] in the fall of 1963.

---

[15]The extent of the severance is not clear. The termination file introduced by Partake indicated that Werry had been terminated in April. Yet, on December 3, 1963, Partake transferred Werry's status to that of a Partake Associate Area Director.

Between April and June of 1963, plaintiffs experienced numerous difficulties with their respective distributorships, including a shortage of merchandise, a shortage of placements and cancellations of existing placements. Raub and Werry assured them that the difficulties were being ironed out and that the advertising would start soon.

In June, Raub left Pacific and Werry met with the distributors. At this time, some of the plaintiffs learned for the first time that there was no connection between Pacific and Partake.[16] Werry urged them to buy some additional toys to keep things moving on their racks and explained the drop in toy sales as a seasonal matter.

Throughout the summer of 1963, plaintiffs experienced problems with the distributorships. By the fall, Werry concluded that the operation could be salvaged only through full-time activity and decided to sell Pacific to Claude Elmore (hereafter Elmore) who had additional "rack" items and experience with selling through grocery stores. Werry indicated to plaintiffs that Elmore would honor the Pacific contracts and return of their investment after a year. After Elmore refused to do so, some of the plaintiffs, under duress, signed royalty agreements with Elmore and Werry. Werry resigned as President of Pacific on October 14, 1963, and was replaced by Elmore. Each of the plaintiffs continued to service his route and attempted to sell some of the merchandise that they had been left. On August 5, 1964, Pacific was declared bankrupt at the request of its creditors, including some of the plaintiffs, and this action ensued.

The court found that in making the representations to plaintiffs, Raub was acting within the scope of his partnership with Werry and in furtherance of its agreed purpose; that Raub utilized the Partake office and name, and various items of Partake promotional literature to convince plaintiffs of the truth of his statements about Partake; and that each of said representations was false, in that: (1) Western Way and Pacific were not affiliated with Partake in any manner; (2) there were no past sales records for the merchandise sold to plaintiffs which in any way justified the statements that plaintiffs could earn a minimum net income of $11,054 per year; (3) no extensive surveys had been made to determine whether the number of placements called for in plaintiffs' contracts could, in fact, be made, and the personnel hired to

---

[16]Each plaintiff discovered this fact about two months after signing his contract.

make these placements were not specially trained; (4) Western Way and Pacific did not have established contracts with outlets for other types of toys and hardware, and did not, in fact, know whether they could obtain such products, how many they could obtain, and whether the products that could be obtained would sell on racks; and (5) neither Western Way nor Pacific had made any arrangements for advertising, and no officer of Western Way or Pacific had any intention of sponsoring such advertising.

The court further found that Raub made the misrepresentations with the intent of inducing plaintiffs to enter into contracts with Western Way and Pacific; that each of the representations was, in fact, a material inducement for plaintiffs to enter into their contracts; that plaintiffs reasonably relied on the representations in entering into distributorship agreements with Western Way and/or Pacific; that as a result of entering into these agreements in reliance on Raub's misrepresentations, each of the plaintiffs was damaged in the amount of the difference between the sum he paid for his distributorship and the fair market value of said distributorship at the time of purchase, which was one-fourth of what each plaintiff paid for it; that in addition, each plaintiff was damaged in the amount of the reasonable value of the time and other expense which he incurred without return pursuant to said contract; that Raub knew that each of the representations was false as stated, but Werry did not participate or knowingly acquiesce in the making of the misrepresentations by Raub; and that by signing the supplemental agreements with Pacific, plaintiffs who did so did not waive any rights against any defendant.

As to Partake, the court found that on his March 11, 1963 visit, Melvin learned that Raub was using the Partake office and name, and its promotional and advertising materials to promote the sale of Pacific franchises; that Melvin should have realized that these practices by Raub, together with Raub's association with Werry as Area Director of Partake; were likely to cause prospective Pacific distributors, such as plaintiffs, reasonably to believe that Raub was authorized to state that Pacific was part of Partake; and that by permitting the aforesaid conditions to continue, Partake, through want of ordinary care, caused plaintiffs Schiro, Bottemiller, Yoshimura and Hartong reasonably to believe that Raub, Werry and Pacific were the agents of Partake, and that Raub had authority to make the representations he did make with

respect to Partake; that plaintiffs Schiro, Bottemiller, Yoshimura and Hartong exercised due care in concluding that Werry, Pacific and Raub had such authority, and entered into their contracts with Pacific in good-faith reliance upon such belief; that neither Partake nor Melvin was aware of any of the representations made by Raub to plaintiffs, and that Partake did not receive any benefit from the Western Way or Pacific operations.

The court further found all of the representations made by Raub to plaintiffs with respect to Partake were admissible and binding against Partake to the extent that they were apparently or ostensibly authorized by Partake and that Partake gave Werry and Raub such ostensible and apparent authority by: (1) permitting them to utilize the Partake office, name and promotional materials; (2) giving Werry the title of Area Director; and (3) permitting Werry and Raub to continue using the aforesaid indicia of authority after Melvin became aware of the facts on March 11, 1963.

The court also found that Raub represented to all of the plaintiffs (except Ott) that Raub was an agent of Partake, Inc.; that Partake expressly represented to certain of the plaintiffs, through its literature, that Werry was an Area Director of Partake. However, Partake did not expressly represent to any of the plaintiffs through its literature or correspondence that Raub, Western Way or Pacific were part of Partake; that Werry was not an actual agent of Partake pursuant to section 2299 of the Civil Code, but an independent contractor, or nonservant agent, as defined in the Restatement Second of Agency; that Raub was not an actual agent of Partake, pursuant to section 2299 of the Civil Code but was a lawfully appointed subagent, under Civil Code section 2351; that Pacific was not an actual agent of Partake but Werry, Raub and Pacific were ostensible agents of Partake pursuant to section 2300 of the Civil Code.

As to Werry, the court found that he did not actually participate or knowingly acquiesce in the fraudulent acts committed by Raub but was required to indemnify Partake for all sums paid to plaintiffs pursuant to his Area Director agreement with Partake.

As to plaintiffs, the court found that none of them had knowledge of the termination notice issued by Partake to Werry on April 1, 1963; that the clause in the Pacific contracts to the effect that "this agreement contains the entire agreement of the parties herein," did not apply to representations made to induce plaintiffs to enter into the contract,

but applied only to exclude evidence of oral agreements contrary to the terms of the written contract and, accordingly, did not preclude plaintiffs from relying upon oral representations by Raub pertaining to the relationship between Western Way, Pacific and Partake.

The trial court concluded that Raub fraudulently induced all plaintiffs (except Ott) to enter into their respective contracts with Western Way and Pacific; that the fraudulent statements made by Raub with respect to Partake after March 11, 1963, were ostensibly authorized by Partake; and Partake was, therefore, liable to those plaintiffs who signed their contracts after March 11, 1963. Accordingly, the trial court entered its judgment against Partake in favor of plaintiffs, Schiro, Hartong, Yoshimura and Bottemiller in the amounts set forth below,[17] as well as against Werry in favor of plaintiffs, Starr and Chadwick, and in favor of Partake against Werry for the total amounts recovered from it and allocated the costs among the various parties.

The first contention on appeal is that the evidence is insufficient to sustain the findings and judgment against Partake. Partake particularly complains of the findings that it was responsible for the representations made by Raub and Werry to plaintiffs and that plaintiffs acted reasonably in believing that Werry and Raub had ostensible or apparent authority to make the representations concerning the relationship between Partake and Pacific.

Partake first argues that since neither Werry nor Raub had actual authority to make these representations to plaintiffs, there can be no liability on the basis of apparent or ostensible authority. Ostensible authority is defined by Civil Code section 2317 as ''such as a principal, intentionally or by way of ordinary care, causes or allows a third person to believe the agent to possess.'' The conditions under which a principal is bound by the acts of his agent under the theory of ostensible or apparent agency are delineated by Civil Code section 2334, which provides: ''A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof.'' Civil Code section 2300 provides: ''An agency is

---

[17]Joseph Schiro, from defendant Partake, Inc., the sum of $8,120; John J. Hartong, from defendant Partake, Inc., the sum of $6,365; Noboru Yoshimura, from defendant Partake, Inc., the sum of $8,538; Donald Bottemiller, from defendant Partake, Inc., the sum of $6,855.

ostensible when the principal intentionally or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him.''

· In applying the above provisions· of the Civil Code, the courts of this state have adopted the principles expressed in sections 261 and 262 of the Restatement Second of Agency (*Rutherford* v. *Rideout Bank,* 11 Cal.2d 479, 482-483 [80 P.2d: 798, 117 A.L.R. 383]). Section 261 provides: ''A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.'' The principal is subject to liability although he is entirely innocent and has received no benefit from the transaction. He is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the party defrauded has notice of this (Rest.2d Agency, § 262).

Liability is based upon the fact that the agent's position facilitates the consummation of the fraud in that from the point of fact of the third person, the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him (*Blackburn* v. *Witter,* 201 Cal.App.2d 518, 521 [19 Cal.Rptr. 842]).

▮ Partake's contention that there can be no liability for the acts of an ostensible agent unless there is some actual authority is entirely without merit. The doctrine establishing the principles of liability for the acts of an ostensible agent rests on the doctrine of estoppel (*Lee* v. *Helmco, Inc.,* 199. Cal.App.2d 820, 834 [19 Cal.Rptr. 413]). The essential elements are representations by the principal, justifiable reliance thereon by a third party, and change of position or injury resulting from such reliance (*Reusche* v. *California Pac. Title Ins. Co.,* 231 Cal.App.2d 731 [42 Cal.Rptr. 262].) ▮ Before recovery can be had against the principal for the acts of an ostensible agent, the person dealing with an agent must do so with belief in the agent's authority and this belief must be a reasonable one. Such belief must be generated by some act or neglect by the principal sought to be charged and the person relying on the agent's apparent authority must not be guilty of neglect (*Hill* v. *Citizens Nat. Trust & Sav. Bank,* 9 Cal.2d 172 [69 P.2d 853]). ▮ Ostensible agency cannot be established by the representations or conduct of the purported agent; the statements or acts of the principal must be such as to cause the third party to believe the agency exists (*Lee* v. *Helmco, supra,* p. 834).

Partake argues that none of the above requirements have been met here. We cannot agree. ■ The trial court found to the contrary and the familiar rule that the trier of fact is the sole judge of the credibility of the witnesses and the weight of the evidence, is applicable (*Estate of Teel*, 25 Cal.2d 520, 527 [154 P.2d 384]). The test is not whether there is a conflict in the evidence but whether there is evidence of a substantial nature that will sustain the findings of the trial court (*Blackburn* v. *Witter, supra,* pp. 521-522). The record here is replete with substantial evidence to support the findings of the trial court.

■ It is undisputed that Werry's duties as Area Director for Partake included the development of new businesses like Pacific and that Werry had the authority to hire Raub as Associate Area Director. Partake, in accordance with its policies, made no check on Raub or his qualifications. Both Werry and Raub made extensive use of the Partake name and office and the "confidence-inspiring" materials provided by Partake. Partake permitted these uses to continue even after March 11, 1963, when Melvin became aware of the fact that Raub was using the Partake office and materials to sell Pacific franchises. Partake's contention that it was not aware of these facts is negated by one of the grounds expressly stated in its April 1 termination notice to Werry, namely: "*Use of Partake advertising, office, and program to sell unauthorized franchise packages.*" Despite the abuses discovered by Melvin, Partake made no further investigations and left all of its materials with Werry until he returned them in the fall of 1963. The trial court cautiously concluded that only the four plaintiffs who had signed their contracts after Melvin's visit of March 11, during the course of which he had notice of Werry and Raub's activities, were entitled to recover from Partake. We think there can be no question that the evidence fully supports the judgment (*Blackburn* v. *Witter, supra; Bayuk* v. *Edson,* 236 Cal.App.2d 309, 315 [46 Cal.Rptr. 49]; *California Motor Express, Ltd.* v. *Chowchilla Union High School Dist.,* 202 Cal.App.2d 314, 319 [20 Cal.Rptr. 768]).

Even more persuasive than the above authorities is *Lee* v. *Helmco, Inc., supra,* 199 Cal.App.2d 820. The facts of *Helmco* are strikingly similar to those of the instant case. Defendant, Helmco, an Illinois corporation, entered into an agreement with defendant Scanlan, stating that the latter was an independent contractor without authority to obligate Helmco financially or in any other way. Helmco, however, gave Scan-

lan certain indicia of authority, namely: 1) the authority to accept orders on behalf of Helmco, which was expressly stated in a purchase order containing Helmco's name; 2) authority to use Helmco's name in connection with anything that would assist Scanlan in making sales, including a sign on the door, a telephone and stationery; and 3) authority to accept checks made payable to Helmco. Scanlan thereafter represented to the plaintiff that if he purchased certain food dispensing machines manufactured by Helmco, they would be received by December 1955, and placed in excellent business locations so that plaintiff could earn a profit up to $300 a month. The machines did not arrive until March 1956, the locations proved very undesirable, plaintiff never received any income and was unable to dispose of them. In affirming a fraud judgment against Helmco in favor of the plaintiff on the basis of ostensible agency, the court rejected several contentions identical to those raised by Partake here and held that the indicia of authority given to Scanlan caused the plaintiff to believe that Scanlan was authorized to make the statements he did, and thus Helmco was liable. The facts of the instant case are stronger as there was here no such express disclaimer as in Helmco.

Cases such as *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958], and similar authorities cited by Partake, are not in point. In *Hobart,* the attorney was held not to be an ostensible agent of the corporation as he did not purport to be acting as an agent for the corporation and the plaintiffs were aware of this fact. In distinguishing *Rutherford* v. *Rideout Bank, supra,* the court said in *Hobart* at page 452: ''. . . there the bank manager who was guilty of the fraudulent representations purported to be acting for the bank, plaintiff believed he was so acting and was authorized to do so, and, in addition, it was customary for the manager to make statements to customers upon matters such as those embraced by the representations.'' Here, Raub purported to be acting for Partake, and plaintiffs believed he was so acting and was authorized to do so. In addition, it was customary for Area Directors and their employees to make statements to prospective franchisees on matters like the relationship between Partake and its franchisors. Partake had taken no effective steps to negate Raub's ostensible authority prior to the representations.

Nor need we discuss in detail Partake's contention that the trial court should have excluded certain portions of the testimony of plaintiffs Starr and Chadwick. The trial court

properly concluded that the representations made by Raub to these plaintiffs were admissible and binding against Partake to the extent that they were ostensibly authorized by Partake (Rest.2d Agency, §§ 284, 286, 291).

Furthermore, the ostensible authority here extended to Raub as well as Werry. Section 264 of the Restatement Second of Agency provides: ''The rules applicable to representations by servants and other agents are applicable to representations by subservants and other subagents made in connection with transactions conducted for the principal.'' The distinction between the subagents and subservants is of significance in some areas, such as the principal's liability for compensation of the subagent. As to liability for fraud, however, the principal is liable for the activities of both subagents and subservants (Rest.2d Agency, Appendix, § 5, p. 33). *Bank of Cal.* v. *Western Union Tel. Co.*, 52 Cal. 280 (decided long before the adoption of the Restatement) indicates that a principal is just as liable for the fraud of a subagent as he is for that of an agent. In *Western Union,* their agent for receipt and transmission of dispatches in certain areas employed a young man by the name of Crowell. One day when Washburn was absent, Crowell sent a telegram to the Bank of California in San Francisco instructing the bank to pay to Charles H. Crowley $1,200 in gold and signed the name of the cashier of the Colusa County Bank. Crowell then went to the bank in San Francisco, identified himself as Mr. Crowley, was paid the $1,200 and disappeared. The bank sued Western Union for the fraud of Crowell. The lower court's judgment for Western Union on the basis that it could not be held for the fraud of an unauthorized subagent was reversed by the Supreme Court.

 Partake next argues that the trial court's special finding that Werry was not an actual agent of Partake is inconsistent with the other findings and judgment based on the theory of ostensible authority. We think the argument is specious under the circumstances of this case. Clearly, the court felt that a finding that either Werry or Raub was an actual agent would necessarily imply that their acts were authorized which, of course, they were not. Furthermore, the court's finding expressly states that while Werry was not an actual agent, he was a nonservant agent. The court's findings are consistent with a theory that a person may at one and the same time be both an actual agent as to authorized actions and an ostensible agent as to unauthorized actions. Thus, while

Werry remained at all times as an actual agent as to certain actions, as to the transactions covered by the complaints in the instant case, he was an ostensible agent only. The same is true for Raub, who had been an actual subagent, but was only an ostensible subagent as to his unauthorized representations.

Furthermore, as indicated above, Werry appointed Raub as Associate Area Director and had the authority to do so. Thus, pursuant to Civil Code section 2349, subdivision 4,[18] his appointment of Raub as a subagent was valid as being impliedly authorized by Partake. Accordingly, section 2350 of the Civil Code[19] does not apply and the applicable section is Civil Code section 2351, which provides: "A subagent, lawfully appointed, represents the principal in like manner with the original agent; and the original agent is not responsible to third persons for the acts of the subagent."

Partake's additional contention that Raub's function as an Associate Area Director for Partake had ceased by the time Pacific was incorporated on March 6, 1963, and plaintiffs entered the picture, is not relevant. In the first place, none of the plaintiffs were aware of this fact. In the second place, even though, in fact, Raub ceased his activities as the Associate Area Director of Partake, as to plaintiffs he remained an ostensible agent for Partake, by his continued use of the Almendra office and Partake materials. The fact that he may have been acting solely as Vice President of Pacific is likewise immaterial as, insofar as plaintiffs were concerned, he had ostensible authority to state that Pacific was a part of Partake.

As to plaintiffs' reliance on the representations made, Partake argues that plaintiffs are barred from recovery because they were negligent in failing to ascertain the extent of Raub's true authority, and, in any event, because some of them conducted independent investigations.

The basic requirements of justifiable reliance are set forth in *Seeger* v. *Odell*, 18 Cal.2d 409 at pp. 414 and 415 [115 P.2d 977, 136 A.L.R. 1291], as follows: "Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent. (See cases cited in 12 Cal.Jur.

[18]"An agent, unless specially forbidden by his principal to do so, can delegate his powers to another person in any of the following cases, and in no others: . . . 4. When such delegation is specially authorized by the principal."

[19]"If an agent employs a subagent without authority, the former is a principal and the latter his agent, and the principal of the former has no connection with the latter."

758, 759; Prosser, Torts, 748.) ▮ As a general rule negligence of the plaintiff is no defense to an intentional tort. (See Prosser, Torts, 402.) ▮ The fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar his recovery (Rest. Torts, § 540; see cases cited in 12 Cal.Jur. 758, 759). . . . ▮ Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man. Exceptionally gullible or ignorant people have been permitted to recover from defendants who took advantage of them in circumstances where persons of normal intelligence would not have been misled. (See cases cited in 6 Cal.Jur.Supp. 45 (note 13); Prosser, Torts, 749.)'' A plaintiff will be denied recovery only if his conduct is manifestly unreasonable in the light of his own intelligence or information. It must appear that he put faith in representations that were "preposterous" or "shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth." (See also *Cortez* v. *Weymouth,* 235 Cal.App.2d 140, 151-152 [45 Cal.Rptr. 63].) ▮ Even in case of a mere negligent misrepresentation, a plaintiff is not barred unless his conduct, in the light of his own information and intelligence, is preposterous and irrational (*Van Meter* v. *Bent Constr. Co.,* 46 Cal.2d 588 [297 P.2d 644]).

▮ Here, none of the plaintiffs had any experience or familiarity with franchising or distributorships. Partake admittedly held itself out as an expert consultant for potential franchisees and provided a variety of "confidence-inspiring materials" designed to make people who wanted to go into business for themselves trust the Partake Area Director. Raub's presence in a Partake office with these materials confirmed plaintiffs' beliefs (based on Raub's intentional misrepresentations) that they were entering into distributorship agreements with a subsidiary of Partake or a franchise approved by Partake. Raub's statements concerning the national scope and financial stability of Partake were borne out by the materials. Werry's picture as Area Director for California in some of the materials confirmed Raub's statements. The fact that after the signing of some of the contracts Raub asked plaintiffs to bow their heads in a prayer for the success of the venture they had just undertaken was completely consistent with the spiritual emphasis of the Partake motto and materials (see fn. 2 above).

In addition, plaintiffs' suspicions were repeatedly deflected

by plausible assertions of fact. For example, when some of the plaintiffs noticed that the agreements they were signing were not with Partake but with Pacific or Western Way, they were told by Raub that these companies were the western branch or the western part of Partake. If the defendant makes a plausible explanation of fact, the plaintiff is not required to further investigate (*London* v. *Guberman,* 214 Cal.App.2d 215, 219-220 [29 Cal.Rptr. 279]).

Where a plaintiff commences an investigation, his failure to discover the truth may be excused by the defendant's superior knowledge of the facts, the difficulty in ascertaining all of the facts or plaintiff's incompetence to judge the facts without expert assistance (*Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412 [159 P.2d 958]). The fact that a plaintiff may have relied to some extent on independent advice does not bar his recovery (*Wennerholm* v. *Stanford University School of Medicine,* 20 Cal.2d 713, 717 [128 P.2d 522, 141 A.L.R. 1358]). Even if the plaintiff discovers some suspicious circumstances, his reliance is reasonable if the defendant allays his doubts with further assurances (*Garrett* v. *Perry,* 53 Cal.2d 178, 181-182 [346 P.2d 758]).

Thus, the fact that some of the plaintiffs checked out "Partake" with the Better Business Bureau is no bar to their recovery. In most instances, only "Partake" was checked out and apparently accurate information given on the national scope and sound financing of Partake, thus further confirming the representations made. The fact that the Better Business Bureau had no specific information about Pacific was completely consistent with the representations that Pacific was a new western branch of Partake.

The general rule is that one has a right to rely on statements of material facts essentially connected with the substance of the transaction where one of the parties is ignorant or inexperienced in regard to matters concerning which material misrepresentations are made and such ignorance is known to the other party who is also aware that reliance is being placed on his representations and that the facts are not and cannot be expected to be within the first party's knowledge (*Wilke* v. *Coinway, Inc.,* 257 Cal.App.2d 126, 137 [64 Cal.Rptr. 845]). Here, it is undisputed that all of the plaintiffs were completely ignorant about the franchise and distributorship business and that Partake, Werry and Raub were held out as experts. Plaintiffs had no way of ascertaining the nature of the relationship between Partake and Pacific nor did they have any reason for doing so. As Raub

was in an office labeled "Partake," with a telephone answered "Partake" and containing the map showing the location of Partake Area Directors and other impressive Partake materials, plaintiffs had no reason to think that he was not telling the truth. The introduction of Werry as Area Director provided further confirmation. Under these circumstances, there was no lack of ordinary care on the part of plaintiffs, or any conduct manifestly unreasonable in the light of the information available to them.

Furthermore, nothing said or done by Raub was so extraordinary as to be beyond the bounds of his apparent authority, as in *Curtis* v. *Hannaford & Talbot,* 236 Cal.App.2d 182, 185 [45 Cal.Rptr. 785], where the particular circumstances indicated want of ordinary care by the plaintiff. As to reliance, the instant case more closely resembles the facts of *Kahn* v. *Gordon,* 249 Cal.App.2d 722 [57 Cal.Rptr. 725], and *Blackburn* v. *Witter,* 201 Cal.App.2d 518 [19 Cal.Rptr. 842]. In *Blackburn,* the investor, a woman without business experience, selected the appellant's agent for her financial advisor. The agent advised her as to what stock to buy and sell and for a time the results were satisfactory. Eventually, he had her invest in a certain company and gave her in return a receipt later supplemented by a promissory note, neither one of which was written on company stationery, explaining that no such stationery was available at the time because of the newness of the company. Although the agent had no authority to borrow the money for his personal use, the limitation had not been made known to the investor. On appeal from the judgment against the principal, it was argued that the transaction differed so radically from the previous transactions (for which the respondent had always received receipts on company stationery and a record on the monthly statements) that respondent, as a reasonable person, must have known the agent was acting for himself. The court held, in affirming, that the evidence was sufficient to bring the case within the provisions of section 261 of the Restatement of Agency.

In *Kahn,* the respondents were persons of limited financial experience to whom the appellant had indicated that the agent had a broad and general authority to look after their account. A course of successful transactions there likewise led the respondents to reasonably trust the agent. A departure from standard practice in the form of the complained of transactions was, from the point of view of respondents, reasonably explained by the haste with which the arrangements

were completed. Appellant failed to give any warning of limitations on the agent's authority. This court (Division Four) found no significant grounds to distinguish *Kahn* from *Blackburn*.

Similarly, here, during the initial period of time immediately after the signing of their contracts until Raub left in June, some of the plaintiffs experienced satisfactory sales well within the 10 sales per rack per week figure that had been quoted to them. Thus, there was also a series of successful transactions that led them to reasonably trust Raub and his authority. We hold that the trial court properly concluded that plaintiffs' reliance was reasonable, in good faith, and their recovery not barred by such independent investigations as they made.

Finally, Partake argues that the trial court used an erroneous measure of damages. The trial court's finding that the fair market value of each of the distributorships was only one-fourth of the amount that each plaintiff had paid for it is not challenged. Partake's argument of error is confined to the "additional damages" awarded for the time expended and other expenses incurred after each of the plaintiffs discovered, in the late summer or early fall of 1963, that Partake had nothing to do with Pacific. After this discovery, each of the plaintiffs attempted to get rid of their large stocks of merchandise by covering their routes and making additional sales. Partake contends that they were not entitled to compensation for these activities, and that, in any event, the trial court applied the wrong method in determining "additional damages."

As to the first contention, plaintiffs' duties to mitigate damages under the circumstances cannot be questioned (*Kruse* v. *Miller*, 143 Cal.App.2d 656 [300 P.2d 855, 61 A.L.R.2d 1231]; Rest., Torts, § 918). A party who fulfills his duty to minimize damages may recover the reasonable cost of doing so, provided that it does not exceed the damages prevented or reasonably anticipated (*Kleinclaus* v. *Marin Realty Co.*, 94 Cal.App.2d 733, 739 [211 P.2d 582]; *Basin Oil Co.* v. *Baash-Ross Tool Co.*, 125 Cal.App.2d 578, 607-609 [271 P.2d 122]; Rest. Torts, § 919). We discount Partake's contention, made at oral argument, that, as a matter of law, plaintiffs were not entitled to damages to reimburse them for their efforts to ply their routes after discovery of the fraud. Under the circumstances of this case, plaintiffs were not unreasonable in attempting to dispose of their large stocks of merchandise.

The proper measure of damages for fraud is set forth by Civil Code section 3343, quoted below.[20] As the basic rule of fraud damages is severely limited in California, the courts have tended toward a liberal computation of "additional damages" (*Clar* v. *Board of Trade,* 164 Cal.App.2d 636 [331 P.2d 89]), which include the reasonable value of time fruitlessly expended by a plaintiff in reliance on the representations of a defendant (*Lawson* v. *Town & Country Shops, Inc.,* 159 Cal.App.2d 196 [323 P.2d 843]). In assessing the damages, the court must attempt to properly compensate each plaintiff as nearly as possible for the loss he incurred due to the fraud (2 Witkin, Summary of Cal. Law (1960) p. 1594; Rest., Torts, §§ 901, 903, 906). If the fact of damage is clear, a trial court is permitted a reasonable approximation in determining the amount (2 Witkin, *supra,* p. 1596).

 Here, each of the four successful plaintiffs came from a different background, with different skills, different education and earning capacity. For example, plaintiff Schiro earned a little over $5 an hour in his grading and paving business; plaintiff Hartong was a college student when he signed his Pacific agreement and later earned about $3 an hour as a savings and loan officer; plaintiff Yoshimura, a retired army officer, had earned between $6 and $8 an hour as a travel agent and interpreter; plaintiff Bottemiller, a driver for Union Oil, earned about $3.40 an hour. Following the mandate of Civil Code section 3333, the trial court reimbursed each of the four plaintiffs for their out-of-pocket telephone and mileage expenses and computed the value of each plaintiff's time on the basis of what he earned in his regular employment.

The evidence indicated that in the metropolitan areas covered by plaintiffs' distributorships, 200 racks were considered full-time; 100 racks part-time. As none of the plain-

---

[20]Civil Code section 3343: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction.

"Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled."

As to the additional damages, section 3333 of the Civil Code provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

tiffs purchased more than 100 racks, all of them worked part-time.[21] The representations of potential annual profits in the amount of $11,054 made to all of the plaintiffs was admittedly based on part-time activity, i.e., 100 racks at 10 sales per rack per week. Using these figures and computing part-time activity on the basis of 20 hours a week, the remuneration represented would be in excess of $10 an hour. If part-time activity took 30 hours a week, the remuneration represented would be around $7.50 an hour.

In no case were the ''additional damages'' awarded to each of the plaintiffs, based on a calculation of what they had earned at their full-time jobs, as high as $10 an hour. In fact, the highest figure found by the trial court was that for plaintiff Yoshimura of $6 to $8 an hour. Accordingly, the approach used, even if we assume it to be erroneous, nevertheless clearly favored Partake.

We note that Partake suggested no method of calculating the damages to the trial court. We conclude that under the particular circumstances, and in the absence of any suggested authority as to how fraud damages for part-time activity were to be computed, the method adopted by the trial court was fair and reasonable and, most important, in no way prejudicial to Partake or any other defendant.　Furthermore, as to the three plaintiffs who were induced to sign the additional royalty agreement by further misrepresentations and the duress of a threatened total loss of his investment, the trial court properly concluded that the subsequent investments did not impair their right to damages (*Holcomb* v. *Long Beach Inv. Co.*, 129 Cal.App. 285, 290-292 [19 P.2d 31] ; *Lawson* v. *Town & Country Shops, Inc.*, 159 Cal.App.2d 196, 205 [323 P.2d 843] ).

Affirmed.

Shoemaker, P. J., and Agee, J., concurred.

A petition for a rehearing was denied November 29, 1968, and appellant's petition for a hearing by the Supreme Court was denied December 24, 1968.

---

[21]Only Schiro actually gave up his regular employment. If a plaintiff is induced by fraud to give up a job, he is entitled to recover the salary he would have earned if he had not given up the position (*Sutter* v. *General Petroleum Corp.*, 28 Cal.2d 525, 534 [170 P.2d 898, 167 A.L.R. 271]). By limiting Schiro's compensation at its former hourly rate of $5 rather than granting him his entire loss of salary, his recovery was considerably less than he was legally entitled to.